# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA**,

    Plaintiff,

vs.                                                                        No. **CR 02-294 MCA**

**NICOLAS PACHECO, JR.**,

    Defendant.

## MEMORANDUM OPINION AND ORDER
## DENYING DEFENDANT'S MOTION TO SUPPRESS

**THIS MATTER** came before the Court on Defendant Nicolas Pacheco Jr.'s Motion to Suppress [Doc. No. 39] filed on June 5, 2002. On June 26, 2002, the Court held an evidentiary hearing on Defendant's motion in Albuquerque, New Mexico. Having fully considered the pleadings of record, the applicable law, the evidence, and the arguments of counsel presented at the hearing, and being fully advised in the premises, the Court **DENIES** Defendant Nicolas Pacheco Jr.'s Motion to Suppress based upon the following findings of fact and conclusions of law.

## I.     FINDINGS OF FACT

    1.    New Mexico State Police Officer Rudy Mora was on duty on traffic patrol along Interstate 40 about fifteen to twenty miles west of Albuquerque, New Mexico between

approximately 7:35 a.m. and 8:10 a.m. on or about February 14, 2002, when the events described below occurred.

2. While traveling westbound on I-40, Officer Mora observed a white Pontiac four-door vehicle traveling in the opposite direction in the eastbound lane of the highway at a faster speed than other vehicles. Officer Mora engaged his radar and clocked the white Pontiac traveling eighty-six miles per hour. The speed limit for the highway on which the white Pontiac was traveling is seventy-five miles per hour.

3. Officer Mora turned his state police vehicle around and followed the white Pontiac. As the officer pulled up to the white Pontiac in an effort to observe whether its occupants were wearing seat belts, the white Pontiac swerved into the passing lane occupied by the officer's vehicle, causing the officer to take evasive action. Officer Mora then pulled his vehicle behind the white Pontiac and engaged his emergency lights. The white Pontiac promptly responded by pulling over to the side of the highway and stopping.

4. After the two vehicles were stopped beside the highway, Officer Mora approached the passenger side of the white Pontiac alone on foot wearing his canine officer uniform with his gun holstered. The officer's dog, "Chica," remained in the back of the officer's vehicle. As Officer Mora approached the white Pontiac on foot, he noticed for the first time that Defendant was the driver of the vehicle and that Defendant appeared to be Hispanic.

5. Upon reaching the front passenger door of the white Pontiac, Officer Mora informed Defendant that he was stopped for speeding and for crossing into the lane occupied

by the officer's vehicle. Officer Mora also requested to see Defendant's driver's license and the registration and insurance papers for the white Pontiac. Defendant explained that his reason for crossing the lane was that the sun was in his eyes.

6. While conversing with Defendant and awaiting production of the requested documents, Officer Mora smelled a strong, sweet odor emanating from the interior of the white Pontiac. The officer could not identify the source of the odor. Officer Mora also observed a female passenger in the back seat of the white Pontiac who was not wearing a seat belt.

7. While sitting in the white Pontiac with his hands trembling in a manner that indicated nervousness, Defendant handed the requested license, registration, and insurance documents to Officer Mora. Upon reviewing these documents, Officer Mora observed that Defendant's driver's license was issued by the State of Georgia on January 29, 2002, that the date of registration on the registration form for the white Pontiac was February 2, 2002, and that according to the insurance card, the insurance for the white Pontiac had been purchased in cash on February 4, 2002.

8. Officer Mora instructed Defendant to exit the white Pontiac and stand outside while the officer reviewed the requested documents and wrote the citations for speeding and crossing the lane. Defendant complied with this instruction. Officer Mora and Defendant continued to converse while the officer reviewed the requested documents and wrote the citations.

9. From his conversation with Defendant, Officer Mora gleaned the following information. Defendant appeared nervous and talkative. He said he was cold, but did not have a jacket. He also said that he purchased the white Pontiac five months prior to the stop, that he was traveling from California to Georgia to visit his mother, and that he had been staying with his aunt in California for the past three weeks. Defendant identified the passenger who was in the back seat of the white Pontiac as his aunt. Defendant also repeatedly attempted to change the subject of the conversation by asking Officer Mora about how to become a law enforcement officer.

10. After conversing with Defendant, Officer Mora returned to the white Pontiac to look at its vehicle identification number (VIN) and to issue a citation to the passenger for not wearing a seat belt. During the conversation with the passenger that ensued, the passenger told Officer Mora that she was going from California to Georgia to visit a friend and that Defendant had been in California staying with a girlfriend.

11. Officer Mora then issued a citation to the passenger for the seat-belt violation and two citations to Defendant for speeding and crossing the lane. The officer returned all of Defendant's license, registration, and insurance documents to him along with the citations. Officer Mora explained the options for contesting or admitting the violations alleged in the citations, and Defendant signed the portion of the citation form indicating he would admit the violations and pay the fine.

12. At the time he issued the citations, Officer Mora had reason to suspect that criminal activity was afoot based upon the totality of the circumstances presented by the

evidence available to him at that time including: (1) the strong, unidentified odor emanating from the white Pontiac, (2) Defendant's nervous demeanor, (3) Defendant's attempts to change the subject of the conversation, (4) the apparent inconsistencies between Defendant's account of his travel plans and that of the passenger, (5) the apparent inconsistency between Defendant's recollection of when he purchased the white Pontiac and the purchase date indicated on the vehicle registration form, (6) the apparent inconsistency between Defendant's statement that he had been in California for three weeks and the exam date listed on his temporary Georgia driver's license, and (7) the recency of the issuance of Defendant's driver's license, the registration date for the white Pontiac, and the date on which insurance was purchased for that vehicle.

13.  After issuing the citations and returning Defendant's documents to him, Officer Mora asked Defendant if he was carrying drugs, weapons, or large amounts of money. Defendant responded in the negative, but looked away from the officer when asked whether he was carrying any cocaine.

14.  After asking these questions, Officer Mora told Defendant in a normal tone of voice that he wanted to search Defendant's vehicle and requested Defendant's consent to search the vehicle verbally and in writing. Defendant responded in the affirmative and signed the consent form.

15.  Defendant asked the passenger to exit the vehicle and repeated the same procedure with her in the Spanish language, except that he did not ask her to sign the consent form because she said that she could not read.

16. Upon receiving verbal and written indications of consent to search the white Pontiac and continuing to have suspicions that criminal activity was afoot, Officer Mora summoned his dog and accompanied the dog around the perimeter of Defendant's vehicle for the purpose of detecting whether the odor of narcotics was emanating from the vehicle.

17. Officer Mora's dog, "Chica," is a certified drug-detection dog that is trained to detect the odor of cocaine and passively alert or indicate to such an odor by sitting down. In this case, Officer Mora observed his dog indicate to the area near the seam between the front passenger door and the front quarter panel of Defendant's vehicle. The officer subsequently allowed the dog to enter the passenger compartment of the vehicle, where the dog indicated to the dashboard area.

18. Officer Mora then visually inspected the dashboard area of the white Pontiac and noticed that some of the screws in that area showed signs of tampering. Officer Mora also observed that the fuse for the vehicle's airbag was missing.

19. After making these observations of the dashboard, Officer Mora proceeded to unscrew and remove the airbag area of the dashboard from the white Pontiac. Hidden behind the vehicle's airbag, Officer Mora found packages containing a white powdery substance that was later determined to contain approximately fifteen kilograms of cocaine. Officer Mora then arrested Defendant and the passenger. It was not contested that Defendant was advised of his Fifth Amendment rights under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966) before any further questioning took place.

## II. LEGAL ANALYSIS AND CONCLUSIONS OF LAW

The central question of constitutional importance in this case is whether Officer Mora was justified in further detaining Defendant and searching Defendant's vehicle after completing the process of issuing traffic citations to Defendant and his passenger. Based upon the officer's reasonable suspicion that Defendant was involved in criminal activity, the Court concludes that the answer to this question is yes.

### A. Fourth Amendment Claim

The Fourth Amendment to the United States Constitution protects Defendant's right to be secure in his person and effects against unreasonable searches and seizures. "[A]utomobiles are 'effects' under the Fourth Amendment, and searches and seizures of automobiles are therefore subject to the constitutional standard of reasonableness." United States v. Chadwick, 433 U.S. 1, 12 (1977), overruled in part on other grounds, California v. Acevedo, 500 U.S. 565 (1991). In addition, "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of" the Fourth Amendment. Whren v. United States, 517 U.S. 806, 809-10 (1996). Thus, Defendant was seized within the meaning of the Fourth Amendment when Officer Mora stopped his vehicle to cite him for traffic violations. See id.

Such a seizure is "reasonable" under the Fourth Amendment "'if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring.'" United States v. Callarman,

273 F.3d 1284, 1286 (10th Cir. 2001) (quoting United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995) (en banc)). The subjective motivations of the officer performing the stop are not relevant to determining whether that officer's suspicions are "reasonable" under the Fourth Amendment. See Arkansas v. Sullivan, 532 U.S. 769, 771-72 (2001).

In this case, Officer Mora credibly articulated specific facts which gave rise to a reasonable suspicion that Defendant violated the speed limit on Interstate 40 and committed another traffic violation by crossing into the lane occupied by the officer's vehicle. See Callarman, 273 F.3d at 1283. Thus, the traffic stop of Defendant's vehicle was justified at its inception.

Before issuing a traffic citation, the Fourth Amendment permits a police officer who has made a lawful traffic stop to request a driver's license and vehicle registration from the vehicle's occupants, see United States v. Hunnicutt, 135 F.3d 1345, 1349 (10th Cir. 1998), ask about their travel plans and ownership of the vehicle, see United States v. Rivera, 867 F.2d 1261, 1263 (10th Cir. 1989), and respond to objectively reasonable concerns about the officer's safety, see United States v. Holt, 264 F.3d 1215, 1220-26, 1228-30 (10th Cir. 2001) (en banc). In this instance, Officer Mora's activities prior to the issuance of the traffic citations fell within these permissible boundaries of a traffic stop.

The Fourth Amendment generally requires that a routine traffic stop must end promptly as soon as the traffic citations have been issued and the driver's license, registration, and insurance information have been reviewed and found to be in proper order. See Hunnicutt, 135 F.3d at 1349. There are, however, two relevant exceptions to this general

rule. "First, the officer may detain the driver for questioning unrelated to the initial stop if he has an objectively reasonable and articulable suspicion illegal activity has occurred or is occuring." Id. "Second, further questioning unrelated to the initial stop is permissible if the initial detention has become a consensual encounter." Id.

The first of these exceptions applies in this case because Officer Mora developed a reasonable suspicion of criminal activity which was sufficient to justify further detention for the brief period necessary to allow his dog to smell the odors emanating from the vehicle after the traffic citations had been issued. Thus, it is unnecessary to decide whether the second exception also applies.

The Court's analysis of the basis for Officer Mora's suspicions does not depend on whether or not Officer Mora or Defendant subjectively thought they were involved in a consensual encounter after the traffic citations were issued because "[t]he subjective intentions or state of mind of either the defendant or police is irrelevant to Fourth Amendment analysis." United States v. Sanchez, 89 F.3d 715, 718 (10th Cir. 1996). Further, determining the objective reasonableness of the suspicion that prompted Officer Mora to want to perform a canine sniff around Defendant's vehicle does not depend on any one factor or series of factors. See United States v. Lopez-Martinez, 25 F.3d 1481, 1484 (10th Cir. 1994). Rather, the Court must consider the totality of the circumstances. See United States v. Arvizu, 122 S. Ct. 744, 750 (2002).

"In examining the totality of the circumstances, '[c]ommon sense and ordinary experience are to be employed and deference is to be accorded to a law enforcement officer's

ability to distinguish between innocent and suspicious actions.'" United States v. De La Cruz-Tapia, 162 F.3d 1275, 1277 (10th Cir. 1998) (quoting United States v. Wood, 106 F.3d 942, 946 (10th Cir. 1997)). Reasonable suspicion may be based on "'a series of acts, each of them perhaps innocent in itself, but which taken together warranted further investigation.'" Lopez-Martinez, 25 F.3d at 1484 (quoting Terry v. Ohio, 392 U.S. 1, 22 (1968)). An officer cannot, however, predicate an investigative detention solely upon a hunch, see De La Cruz-Tapia, 162 F.3d at 1277, or rely solely upon generic facts that are so innocent or susceptible to varying interpretations as to be innocuous, see Wood, 106 F.3d at 946.

In this case, the Government presented evidence concerning a number of specific factors which may be readily susceptible to an innocent explanation if considered alone, but which nevertheless combine to form a reasonable basis for the officer's suspicion that criminal activity was afoot. See Arvizu, 122 S.Ct. at 753. In particular, the Court notes the evidence of (1) a strong, unidentified odor emanating from the white Pontiac, (2) Defendant's nervous demeanor, (3) Defendant's attempts to change the subject of the conversation, (4) the apparent inconsistencies between Defendant's account of his travel plans and that of the passenger, (5) the apparent inconsistency between Defendant's recollection of when he purchased the white Pontiac and the purchase date indicated on the vehicle registration form, (6) the apparent inconsistency between Defendant's statement that he had been in California for three weeks and the exam date listed on his temporary Georgia driver's license, and (7) the recency of the issuance of Defendant's driver's license, the

registration date for the white Pontiac, and the date on which insurance was purchased for that vehicle.

The officer's reasonable suspicion based on the totality of the circumstances justified further detention of Defendant and his vehicle for purposes of conducting a canine sniff. "[A] canine sniff of an already legitimately detained automobile is not a 'search' within the meaning of the Fourth Amendment." Hunnicutt, 135 F.3d at 1350. Once Officer Mora's dog indicated to the area near the seam between the front passenger door and the front quarter panel of Defendant's vehicle, the officer had probable cause to continue the search inside the passenger compartment of the vehicle. See United States v. Massie, 65 F.3d 843, 849 (10th Cir. 1995). Once the dog indicated to the dashboard area of the vehicle and Officer Mora observed the missing airbag fuse and the evidence of tampering with the dashboard's screws, the officer had probable cause to continue the search by removing the dashboard in order to uncover the packages of cocaine concealed in the airbag compartment. See id. Because the entire detention and search met the Fourth Amendment's requirement of reasonableness, the exclusionary rule provides no basis for suppressing the evidence or statements that resulted from these activities. See id.

**B. Fifth Amendment Claim**

Although Defendant has indicated that his Motion to Suppress is made "pursuant to the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution," (Mot. to Suppress at 1) the statement of facts and brief in support of his motion only address his claims under the Fourth Amendment. It was not contested that Defendant was given

Miranda warnings before any custodial interrogation took place. Thus, Miranda does not provide a basis for suppressing Defendant's subsequent statements pursuant to the Fifth Amendment. See United States v. Gell-Iren, 146 F.3d 827, 830-31 (10th Cir. 1998).

### C.     First and Fourteenth Amendment Claim

Claims of selective prosecution based on presumptively impermissible factors such as race or retaliation for the exercise of First Amendment rights generally do not implicate the Fourth Amendment, but instead require some other constitutional basis, such as the Fourteenth Amendment's Equal Protection Clause. See Whren, 517 U.S. at 813. The essential elements of a selective prosecution claim include both discriminatory effect and discriminatory intent. See United States v. James, 257 F.3d 1173, 1178 (10th Cir. 2001); Poole v. County of Otero, 271 F.3d 955, 958 (10th Cir. 2001). "To prove discriminatory effect in a race-based selective prosecution claim, a defendant must make a credible showing that a similarly-situated individual of another race could have been prosecuted for the offense for which the defendant was charged, but was not." James, 257 F.3d at 1179; accord Poole, 271 F.3d at 958. As to discriminatory intent, "'the defendant must prove that the government's selection of him for prosecution was invidious or in bad faith and was based on impermissible considerations such as'" race. Poole, 271 F.3d at 958-59 (quoting United States v. Furman, 31 F.3d 1034, 1037 (10th Cir. 1994)).

In this instance, Defendant simply cites the First and Fourteenth Amendments without providing any factual basis or legal argument to show that the essential elements of a selective prosecution claim have been satisfied. In particular, Defendant did not elicit any

meaningful testimony concerning the number of Hispanic individuals Officer Mora has detained and searched, or the number of non-Hispanic suspects the officer could have lawfully detained and searched but did not. Further, Officer Mora testified that he did not even notice Defendant's Hispanic appearance until after he had initiated the traffic stop and was approaching Defendant's vehicle on foot. Thus, the Court concludes that Defendant is not entitled to suppression of the evidence in this case based on a selective prosecution claim. See Poole, 271 F.3d at 959; James, 257 F.3d at 1181.

### III. CONCLUSION

Because the investigative detention, search, and arrest met the applicable constitutional requirements, neither the exclusionary rule nor Defendant's selective prosecution claim provide any basis for suppressing the evidence or statements that were produced as a result of these activities.

**IT IS, THEREFORE, ORDERED** that Defendant's Motion to Suppress be and hereby is **DENIED**.

Dated in Albuquerque this 2d day of July, 2002.

**M. CHRISTINA ARMIJO**
United States District Judge

Counsel for the Government:
    **Tara C. Neda**
    Assistant U.S. Attorney
    Albuquerque, New Mexico

Counsel for Defendant Nicolas Pacheco, Jr.:
    **Edward Chavez Jr.**
    Albuquerque, New Mexico